**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LANNETT COMPANY, INC., | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | NO. 08-338 |
| | : | |
| v. | : | |
| | : | |
| KV PHARMACEUTICAL COMPANY, | : | |
| THER-RX CORP., and DRUGTECH CORP., | : | |
| | : | |
| Defendants | : | |

# OPENING RESPONSE BRIEF OF LANNETT COMPANY, INC., IN OPPOSITION TO COUNTERCLAIM-PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, EARLY PRELIMINARY INJUNCTION HEARING AND PRELIMINARY INJUNCTION

Sophia Siddiqui, Esquire (No. 4914)
Gerard P. Norton, Esquire (*)
Alfred J. Monte, Jr., Esquire (*)
Jonathan R. Lagarenne, Esquire (*)
Joshua M. Hummel, Esquire (*)
Fox Rothschild LLP
Citizens Bank Center
919 N. Market Street, Suite 1300
Wilmington, DE 19801
(302) 622-4278
(302) 656-8920 (facsimile)

(*) Motion for Pro Hac Vice pending

*Attorneys for Plaintiff,*
*Lannett Company, Inc.*

**TABLE OF CONTENTS**

Table of Authorities....................iii

Table of Exhibits....................v

Statement of Facts....................1

Statement of Nature and Stage of the Proceedings....................2

Summary of Argument....................2

Argument....................4

A. Standard....................4

B. Ther-Rx is not likely to prevail on the merits of its claims. ....................5

1. Ther-Rx does not have a reasonable probability of success on its claims for Patent infringement. ....................5

a. At least Claims 1, 21 and 22 of the '666 Patent are obvious. ....................7

2. Ther-Rx does not have a reasonable probability of success on its claims under the Lanham Act. ....................14

a. Lannett has not made any false or misleading statements and is permitted to refer to Ther-Rx's product as "fair use" in comparative advertising. ....................15

i. Lannett's use of Ther-Rx's trademark constitutes a "fair use." ....................16

ii. Use of another's trademark in comparative advertising is permissible. ....................18

b. There has been no actual deception by Lannett, nor is there a tendency that Lannett's product packaging will deceive a substantial portion of the intended audience. ....................21

c. Lannett has not created a defective or inferior product. ....................23

d. Lannett has not created a likelihood of confusion in the market. ....................25

i. Price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase. ....27

ii. Length of time Lannett has used the mark without evidence of actual confusion arising. .... 29

iii. Lannett's intent in adopting the mark. ....29

iv. Evidence of actual confusion. ....29

v. Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media. ....30

vi. Relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors. ....30

vii. Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendants' market. ....31

3. Ther-Rx is not entitled to equitable relief because of its unclean hands. ....32

C. Ther-Rx has not demonstrated the existence of irreparable harm in the absence of the requested injunction. ....34

D. The balance of hardships weighs against the entry of the requested injunction. .... 35

E. The entry of the requested injunction would be contrary to the public interest. .... 36

Conclusion ....38

## TABLE OF AUTHORITIES

Abbott Laboratories v. Sandoz, Inc., 500 F.Supp.2d 846 (N.D.Ill. 2007)....37

Acierno v. New Castle County, 40 F.3d 645 (3d Cir 1994)....5

Adams v. Freedom Forge Corp., 204 F.3d 475 (3d Cir. 2000)....34

August Storck K.G. v. Nabisco, Inc., 59 F.3d 616 (7th Cir. 1995)....16

Bennington Foods LLC v. St. Croix Renaissance Group, LLP, --- F.3d ----, Civil Action Nos. 07-2254 and 07-2313, 2008 WL 2331394, (3d Cir. June 9, 2008)....5, 34

Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211 (3d Cir. 2005)....17

Corning, Inc. v. SRU Biosystems, 400 F. Supp. 2d 653 (D. Del. 2005)....6, 13, 14

Digene Corp. v. Ventana Medical Systems, Inc., 484 F.Supp.2d 274 (D. Del. 2007)....3, 4

G.D. Searle & Co. v. Hudson Pharmaceutical Corp., 715 F.2d 837 (3d Cir. 1983)....18-20

Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160 (3d Cir. 2001)....21, 32, 34

In re Merck & Co., Inc., 800 F.2d 1091 (Fed. Cir. 1986)....7

In re: Relafen Antitrust Litigation, 360 F.Supp.2d 166 (D.Mass. 2005)....37

International Data Group, Inc. v. Ziff Davis Media, 145 F.Supp.2d 422 (D. Del. 2001)....4

Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983)....26

Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 19 F.3d 125 (3d Cir.1994)....15

Klein-Becker USA, LLC v. Product Quest Manufacturing, Inc., 429 F.Supp.2d 1248 (D. Utah 2005)....26

Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004)....4

KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004)....16

KSR Intern. Co. v. Teleflex, Inc., 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007)....6-7, 12, 13

National Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319 (Fed. Cir. 2004)....6

Nature's Best, Inc. v. Ultimate Nutrition, Inc., 323 F.Supp.2d 429 (E.D.N.Y. 2004)....28

Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187 (3d Cir. 1990)....14-15

Pequignot v. Solo Cup Co., 540 F.Supp.2d 649 (E.D. Va. 2008)....33-34

Pfizer, Inc. v. Perrigo Co., 988 F.Supp. 686 (S.D.N.Y. 1997)....27

Precision Inst. Man. Co. v. Aut. Maintenance Mach. Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381(1945)....................32

Richardson-Vicks Inc. v. The Upjohn Company, 122 F.3d 1476 (Fed. Cir. 1997)....................9

Sakraida v. Ag Pro, Inc., 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976)....................9

Sandoz, Inc. v. Food and Drug Admin., 439 F.Supp.2d 26 (D.C. Cir. 2006)....................36

Sanofi-Aventis v. Advancis Pharma. Corp., 453 F.Supp.2d 834 (D. Del. 2006)....................28

Serono Labs., Inc. v. Shalala, 158 F.3d 1313 (D.C. Cir. 1998)....................36

Warner Lambert Co. v. McCrory's Corp., 718 F.Supp. 389 (D.N.J. 1989)....................27

Zoller Laboratories, LLC v. NBTY, Inc., 111 Fed. Appx. 978 (10th Cir. 2004)....................20-21

15 U.S.C. § 1114....................4, 14, 19, 25

15 U.S.C. § 1125....................4, 15, 19, 25

35 U.S.C. § 102....................2

35 U.S.C. § 103....................2, 3, 6, 8, 12-14

35 U.S.C. § 292....................33

**TABLE OF EXHIBITS**

A. U.S. Patent No. 6,576,666 and Notice of Allowance

B. European Patent Application No. EP 0 705 539

C. PCT International Application No. WO 1997/48392

D. Declaration of Michael R. Borenstein, Ph.D.

E. Photographs of product packaging for Lannett Company, Inc.'s Multivitamin with Minerals and Ther-Rx Corp.'s PrimaCare® ONE

F. Declaration of Kevin Smith

G. PrimaCare product information from www.PrimaCareOne.com website

H. Declaration of Ernest J. Sabo

I. Letter from Ther-Rx Corp. dated June 19, 2008

**STATEMENT OF THE FACTS**

Since 1942, Lannett Company, Inc. ("Lannett") has been in the business of developing, manufacturing and marketing generic pharmaceutical products in tablet, capsule and oral liquid forms. Lannett, which has been a pioneer in the United States generic drug industry, is a Delaware corporation headquartered in Philadelphia, Pennsylvania. Lannett currently markets more than sixty (60) products, approximately forty (40) of which are produced in-house.

Lannett planned, developed and has marketed a "Multivitamin with Minerals" capsules, a multivitamin/mineral product containing omega-3 fatty acids for women pre- and post-conception, within the United States. Dietary multivitamin/mineral and omega-3 fatty acid supplements are prescribed by healthcare professionals throughout pregnancy and during the postnatal period for both lactating and non-lactating mothers, and throughout the childbearing years. Lannett's multivitamin is packaged in a white, plastic, screw-top bottle containing thirty (30) capsules.

The Defendants/Counterclaim-Plaintiffs in this case, KV Pharmaceuticals, DrugTech Corporation and Ther-Rx Corporation (collectively, "Ther-Rx")[1], seek to prevent Lannett from marketing and selling its Multivitamin with Minerals. Ther-Rx contends that it holds numerous patents that would prevent Lannett and other competitors from introducing a competitive multivitamin/mineral and omega-3 fatty acid supplementation products in competition with Ther-Rx's product, PrimaCare® ONE. Specifically, Ther-Rx contends that it holds the following patents: U.S. Patent No. 6,258,846 ("the '846 patent"), U.S. Patent No. 6,576,666

[1] DrugTech and Ther-Rx are wholly-owned subsidiaries of KV Pharmaceuticals. DrugTech owns the patents at issue and licenses the patents to KV Pharmaceuticals and Ther-Rx Corporation. Ther-RX is responsible for marketing and selling the patented products at issue. For ease of reference, the Movants have referred to themselves collectively as "Ther-Rx" because Ther-Rx "sells PrimaCare® ONE and PrimaCare® and is most closely associated with these products in the eyes of physicians and patients." (See Ther-Rx's Opening Brief, at 1, n. 1.) Therefore, for the sake of consistency, this brief will also refer to the Movants, in the collective, as "Ther-Rx."

("the '666 patent"), U.S. Patent No. 7,112,609 ("the '609 patent"), U.S. Patent No. 6,197,329 ("the '329 patent"), and U.S. Patent No. 6,569,857 ("the '857 patent"). However, Ther-Rx's Patents are invalid based upon prior art, pursuant to sections 102 and 103 of Title 35 of the United States Code. In light of the invalidity and/or non-infringement of Ther-Rx's patents, Lannett sought assurances from Ther-Rx that it would not assert these patents and thereby block Lannett's entry into the market. Ther-Rx failed or refused to provide those requested assurances.[2]

## STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS

Lannett filed this action on June 6, 2008, seeking a declaratory judgment, inter alia, that Ther-Rx's patents are invalid, that Lannett's Multivitamin with Minerals product does not infringe upon any such patents, and that Ther-Rx has engaged in unfair competition and deceptive trade practices in the marketplace by unlawfully preventing Lannett and others from entering the market. On June 17, 2008, Ther-Rx filed a Counterclaim as well as a Motion for Temporary Restraining Order, Early Preliminary Injunction Hearing and Preliminary Injunction, to which Lannett hereby responds. For the reasons that follow, Ther-Rx's Motion for a Temporary Restraining Order and Preliminary Injunction must be denied.

## SUMMARY OF ARGUMENT

In order to obtain a preliminary injunction, Ther-Rx is required to establish: (1) a likelihood of success on the merits of its claims; (2) that Ther-Rx will suffer irreparable harm in the absence of an injunction; (3) that the balance of the harm to Ther-Rx in the absence of an injunction will be greater than the harm resulting to Lannett if the requested injunction is issued; and (4) that the requested injunction would have a favorable impact on the public interest.

[2] For purposes of expediency, additional facts relevant to Ther-Rx's Motion are incorporated into the pertinent portions of the Argument section, below.

Digene Corp. v. Ventana Medical Systems, Inc., 484 F.Supp.2d 274 (D.Del. 2007). Ther-Rx bears a particularly heavy burden because it seeks a mandatory injunction that will alter the status quo, i.e., by forcing Lannett to recall approximately 400,000 units of multivitamins from the market.

Ther-Rx has failed to establish a likelihood of success on the merits of its claims. Ther-Rx asserts a claim for patent infringement, which fails pursuant to 35 U.S.C. § 103 on the basis of "obviousness." Specifically, there were at least two similar patents in existence before Ther-Rx obtained its relevant patent and, as a result, the subject matter of Ther-Rx's patent was plainly obvious to a person having ordinary skill in the art. Furthermore, Ther-Rx does not have a reasonable probability of success on its claims under the Lanham Act, on the basis of trademark infringement and/or unfair competition or false advertising. Lannett has not made any false or misleading statements and is permitted under the law to use Ther-Rx's trademark, "PrimaCare® ONE" as fair use in comparative advertising. Lannett, a generic pharmaceutical provider, labeled bottles of its product "Compare to the active ingredients in PrimaCare® ONE* *Registered trademark of Ther-Rx Corp." solely for the purpose of comparative advertising, which is entirely appropriate under the law. There has been no actual deception by Lannett, nor does Lannett's product packaging make it likely that a substantial portion of the intended audience will be deceived by Lannett's comparative labeling. Further, Lannett has not created a likelihood of confusion in the market and accordingly, cannot be held liable under the Lanham Act. Finally, inasmuch as Ther-Rx comes to the Court with unclean hands, it is precluded from obtaining equitable or injunctive relief.

Ther-Rx also is not entitled to obtain injunctive relief in this case because it has failed to demonstrate that it will suffer irreparable harm in the absence of an injunction. By contrast,

Lannett would suffer extreme harm if the requested injunction is granted. Therefore, the balance of hardships weigh against granting the requested injunctive relief.

Finally, inasmuch as the entry of the requested injunction would be contrary to the public interest, which recognizes the importance of generic pharmaceuticals, Ther-Rx has failed to satisfy the necessary elements in order to obtain a temporary restraining order or preliminary injunction. Accordingly, Ther-Rx's Motion must be denied.

## ARGUMENT

### A. Standard.

Preliminary injunctive relief is an "extraordinary remedy" that "should be granted only in limited circumstances." Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). In order to obtain a preliminary injunction for infringement of a patent, the moving party must establish four factors: (1) likelihood of success on the merits of infringement; (2) irreparable harm in the absence of an injunction; (3) consideration of the balance of hardships tipping in its favor; and (4) favorable impact on the public interest. Digene Corp. v. Ventana Medical Systems, Inc., 484 F.Supp.2d 274, 279 (D. Del. 2007). The prerequisites for a preliminary injunction in cases of trademark infringement or unfair competition under the Lanham Act, 15 U.S.C. § 1114 and § 1125, and common law unfair competition, are substantially the same. See International Data Group, Inc. v. Ziff Davis Media, 145 F.Supp.2d 422, 431 (D. Del. 2001) (reciting similar standards for injunctive relief in Lanham Act case).

In its Motion for Temporary Restraining Order and Preliminary Injunctive Relief, Ther-Rx seeks, inter alia the entry of a mandatory injunction requiring Lannett to immediately recall all quantities of its product that have been shipped to wholesalers and other third-parties, and to otherwise withdraw Lannett's product from the marketplace. "A party seeking a mandatory

preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir 1994), citing Punnett v. Carter, 621 F.2d 578, 582 (3d Cir.1980). See also Bennington Foods LLC v. St. Croix Renaissance Group, LLP, --- F.3d ----, Civil Action Nos. 07-2254 and 07-2313, 2008 WL 2331394, (3d Cir. June 09, 2008) ("where the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction.") Thus, in seeking the entry of a mandatory injunction in this case, Ther-Rx bears a particularly heavy burden.

**B. Ther-Rx is not likely to prevail on the merits of its claims.**

**1. Ther-Rx does not have a reasonable probability of success on its claims for Patent infringement.**

The US Patent and Trademark Office Examiner allowed the '666 patent for a multi-vitamin composition because "[a]n exhaustive literature search failed to produce any reference to the claimed compounds for use herein claimed. Although compounds claimed by Applicant, [*sic*] reside in the prior [art], the prior art fails to state, or suggest those claimed compounds in the amounts, or ratios herein claimed." (See '666 Patent Notice of Allowance, Exhibit "A" hereto, at page 2). Unknown to the Examiner, readily available prior art showed precisely what the Examiner thought was key to the invention claimed in the '666 patent. The very reason for the allowance of the '666 patent disappears completely in view of prior art the Examiner did not have before him.

In a claim for a preliminary injunction in a patent infringement case, the "reasonable likelihood of success on the merits" requirement encompasses two components: (1) plaintiff will likely show that its patent is infringed; and (2) any challenges to the validity and enforceability of the patent "lack substantial merit." Digene, 484 F.Supp.2d at 279. In other words, once the

accused infringer in a patent infringement case has posed a substantial question as to the patent's invalidity, the patent holder must demonstrate that the invalidity defense lacks substantial merit. National Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir. 2004). Thus, a patent infringement plaintiff is not entitled to a preliminary injunction if the defendant asserts an infringement or validity defense that the plaintiff cannot prove lacks substantial merit. Id. Here, Ther-Rx does not have a reasonable likelihood of success on the merits of its claim for Patent infringement because the subject matter of the '666 Patent was plainly obvious to a person having ordinary skill in the art and, as a result, Ther-Rx's patent is invalid pursuant to 35 U.S.C. § 103.[3]

Obviousness is a question of law predicated upon the following factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations of non-obviousness, such as commercial success, long felt but unsolved need, failure of others to find a solution to the problem at hand, and acquiescence of others in the industry that the patent is valid. Corning, Inc. v. SRU Biosystems, 400 F. Supp. 2d 653, 670 (D. Del. 2005), citing Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Application of these factors leads to the inescapable conclusion that Ther-Rx's patent is invalid for obviousness. "If a person of ordinary skill can implement a predictable variation, Section 103 likely bars its patentability." KSR Intern. Co. v. Teleflex, Inc., 127 S.Ct. 1727, 1740, 167 L.Ed.2d 705 (2007). When determining the nature of a variation, the court "must ask

[3] With respect to its patent-related claims, Ther-Rx has expressly limited its Motion for Temporary Restraining Order and Preliminary Injunction on its claim that Lannett allegedly infringes the '666 Patent and, as a result, Ther-Rx has not provided any substantive discussion in its Motion or Opening Brief regarding any claim that Lannett infringed the '846 Patent or the '609 Patent. (See Ther-Rx's Opening Brief, at 15.) Accordingly, Lannett's response to Ther-Rx's Motion, with respect to the claims for patent infringement, is similarly limited to the '666 Patent.

whether the improvement is more than the predictable use of prior art elements according to their established functions." Id. The obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and steps that a person of ordinary skill in the art would employ." Id. Thus, the issue of obviousness is not a rigid test, but a flexible one. Id. Accordingly, "obviousness does not require absolute predictability," but rather, all that is necessary is "only a reasonable expectation that the beneficial result will be achieved." In re Merck & Co., Inc., 800 F.2d 1091, 1097 (Fed. Cir. 1986).

**a. At least Claims 1, 12 and 22 of the '666 Patent are obvious.**

Ther-Rx asserts as the basis of the pending motion for an injunction that Lannett infringes Claims 1, 21 and 22 of the '666 Patent. Lannett submits that the entire '666 Patent is invalid on the basis of obviousness, although for purposes of addressing Ther-Rx's Motion, Lannett will address only Claims 1, 21 and 22 of the '666 Patent specifically. Those claims provide as follows:

> 1. A composition for administration to a woman for enriching the breast milk of said woman to optimize neurological development of an infant breast-fed by the woman, which comprises:
>
> a) about 10 mg to 100 mg of a first fatty acid compound for each compound selected from the group consisting of a linoleic acid compound, a linolenic acid compound, a derivative thereof and a combination thereof;
>
> b) about 10 mg to 1000 mg of a second fatty acid compound selected from the group consisting of a docosahexaenoic acid compound, an omega-3 fatty acid, an omega-2 fatty acid, a derivative thereof and a combination thereof;
>
> c) about 10 mg to 125 mg of a vitamin $B_6$ compound or derivative thereof;
>
> d) about 0.1 mg to 3 mg of a folic acid compound or derivative thereof;
>
> e) about 100 mg to 2,000 mg of a calcium compound or derivative thereof;

f) about 25 mg to 500 mg of a vitamin C compound or derivative thereof;

g) about 10 mg to 400 mg of a vitamin E compound or derivative thereof; and

wherein the weight ratio of said first fatty acid compound to said second fatty acid compound is about 1:0.1 to 10, said weight ratio specifically formulated to enrich the breast milk of the woman to optimize neurological development of an infant breast-fed by the woman.

21. The composition of claim 1, additionally comprising a vitamin compound selected from the group consisting of a vitamin A compound, a B complex vitamin compound, a vitamin D compound, and variations thereof.

22. The composition of claim 1, further comprising a biologically-acceptable mineral compound which is iron.

(Patent '666, Exhibit "A" hereto, at ¶¶ 1, 21 and 22.)

Claim 1 of the '666 Patent is clearly invalid under 35 U.S.C. § 103(a) as being obvious in light of the European published patent application number EP 0 705 539 ("the '539 Publication"), either alone or in combination with PCT International published patent application number WO 1997/48392 ("the '392 Publication"). (See '539 Publication, Exhibit "B" hereto; '392 Publication, Exhibit "C" hereto.) These publications, both of which were available more than one year prior to the earliest filing date of the '666 Patent yet not reviewed by the Examiner, render claim 1 as nothing more than a composition predicated on arrangements of known elements without any unexpected benefit or result. The '539 Publication, published in 1996, discloses a composition containing multiple fatty acids for optimizing the nutritional needs of a pregnant and/or lactating mother and for promoting the neurological development of the fetus or infant. (See Declaration of Michael R. Borenstein, Ph.D., Exhibit "D" hereto, at p. 3, ¶ 2.) The composition disclosed in the '539 Publication includes each and every component found in Claim 1 of the '666 Patent: (i) a "first" essential fatty acid(s); (ii) a "second" essential fatty acid(s); (iii) vitamin $B_6$; (iv) folic acid; (v) calcium; (vi) vitamin C; and (vii) vitamin E. (See

'539 Publication, Exhibit "B," hereto, at 5; Borenstein Declaration, Exhibit "D" hereto, at p. 9, ¶ 1.)

Where a patent "simply arranges old elements with each performing the same function it had been known to perform," resulting in the same benefit that one would expect from such a combination, then the patent is obvious. Sakraida v. Ag Pro, Inc., 425 U.S. 273, 282, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976). For example, in the context of a prescribed combination drug product, where "[t]he only difference between the prescribed combination and the patented invention is that the prescription was not contained in a single tablet", the patent has been held obvious. See Richardson-Vicks Inc. v. The Upjohn Company, 122 F.3d 1476, 1483-83 (Fed. Cir. 1997). The '539 Publication leaves nothing to the inventive imagination of the artisan of ordinary skill, and the '666 Patent evinces nothing more than an art-accepted core group of essential fatty compounds to be formulated in combination with the usual array of vitamins and minerals previously known in numerous art-accepted prenatal supplements. (See Borenstein Declaration, at pp. 10-12.) Indeed, the '666 Patent itself summarizes prenatal supplements that were known or available to the artisan prior to the earliest effective priority filing date of the '666 Patent.[4]

The composition of the '539 Publication contains both precursor essential fatty acids found in the '666 Patent (i.e., linoleic acid and α-linolenic acid), as well as omega-3 essential fatty acid metabolites (e.g., eicosapentaeonoic acid ("EPA"), docosahexaenoic acid ("DHA"), γ-linolenic acid ("GLA") and arachidonic acid ("AA")). (See '539 Publication, Exhibit "B," hereto. See also Borenstein Declaration, Exhibit "D" hereto, at p. 3, ¶ 2.) Furthermore, the weight ratios of the "first" and "second" fatty acids from Example I of the '539 Publication each

fall within the 1:0.1-10 range recited in Claim 1 of the '666 Patent. (See Borenstein Declaration, at pp. 3-4.) Accordingly, the '539 Publication teaches multiple combinations of a "first" fatty acid compound to a "second" fatty acid compound, all within the weight ratios recited in Claim 1 of the '666 Patent. (See Borenstein Declaration, at p. 9, ¶ 1.)

The '539 Publication further teaches leeway in formulation options and dosing such that the formulation and dosing is not a fixed formulation for each patient. (Borenstein Declaration, at p. 5, ¶ 2.) Table 1 and Example 8 of the '539 Publication illustrate, for example, that different proportions of compositions may be utilized that will fall within the weight ranges recited in Claim 1 of the '666 Patent. (See Exhibit "B," at 7. See also Borenstein Declaration, Exhibit "D" hereto, at pp. 9-10.) For example, the person of ordinary skill may take the lead from Example VIII and create a formulation using 10 grams of powder, instead of the 100 g amount disclosed in Table I. (Borenstein Declaration, at pp. 9-10.) In a 10 gram dose, the amount of linolenic acid (40mg) is within the 10-100mg range recited for a first fatty acid compound of Claim 1. (Borenstein Declaration, at p. 10.) Similarly, the respective amounts of linoleic acid (an omega-6 fatty acid), DHA (an omega-3 fatty acid) and EPA (an omega-3 fatty acid), are each within the 10-1000 mg range recited for a second fatty acid compound of Claim 1. (Borenstein Declaration, at p. 10.) Thus, the '539 Publication teaches multiple combinations of "first" and "second" fatty acid compounds, wherein each fatty acid is within the weight ratio and weight range recited in Claim 1 of the '666 Patent.

The '392 Publication goes one step further and expressly discloses the same vitamin or mineral components within each weight range recited in Claim 1 of the '666 Patent. Table 2 of the '392 Publication discloses commercially-available prenatal tablets containing vitamin $B_6$,

[4] See Col. 3, ln. 63 through Col. 5, ln. 20, for discussion of vitamin and mineral components provided in numerous prenatal supplements including Nestabs® CBF, Materna®, Enfamil®, Natalins RX®, Prenate® Ultra ™, Niferex®,

folic acid, calcium, vitamin C, and vitamin E for administration to a pregnant or lactating woman as a nutritional supplement. (See '392 Publication, Exhibit "C" hereto, at 18-19. See also Borenstein Declaration, Exhibit "D" hereto, at p. 11, ¶ 2.) Each of these disclosed vitamin and/or mineral components fall within the range recited in Claim 1 of the '666 Patent:

| Vitamin | '666 Patent Range (Claim 1(c)-(g)) | '392 Publication Table 2 (for PRENATE® ULTRA) |
|---|---|---|
| vitamin $B_6$ | 10 - 125 mg | 24.3mg |
| folic acid | 0.1 - 3 mg | 1.0mg |
| calcium | 100 - 2,000 mg | 200mg |
| vitamin C | 25 - 500 mg | 123.7mg |
| vitamin E | 10 - 400 mg | 60mg |

Id. The '539 Publication, alone or in combination with the '392 Publication, show there is neither a new or unexpected benefit recited in Claim 1 of the '666 Patent, nor a new ingredient within a range previously undisclosed in the prior art. These recited weight ratios and ranges are art-accepted to provide a nutritional supplement for pregnant or lactating women. (Borenstein Declaration, at p. 11, ¶ 1.) Nothing inventive is left to the mind of the person of ordinary skill to formulate these known components in a composition within the ranges recited in the '666 Patent claims. Id.

Both the '539 Publication and the '392 Publication teach each and every one of the vitamins and minerals recited in Claim 1 of the '666 Patent. (Borenstein Declaration, at pp. 10-12.) The compositions of both the '539 Publication and the '392 Publication are intended for use ***as a nutritional supplement for pregnant or lactating women***. (See Exhibits "B" and "C," hereto.) Thus, the '539 Publication, in combination with the '392 Publication, provide the motivation and teaching for generation of compositions recited in Claim 1 of the '666 Patent, which offers nothing more than a simple arrangement of components known to act as a

---

PN Forte®, Zenate® and Natafort®,

nutritional supplement for pregnant and lactating women. (Borenstein Declaration, Exhibit "D" hereto, at p. 12, ¶ 2.) Accordingly, every element of Claim 1 of the '666 Patent was previously taught in the '539 Publication and the '392 Publication, leaving nothing to the inventive mind of the artisan of ordinary skill to formulate the known components in a composition within the ranges recited in the '666 Patent. Id.

Accordingly, the '539 Publication, alone or in combination with the '392 Publication, provide the motivation and teaching to make the compositions recited in Claim 1 of the '666 Patent for use as a prenatal supplement. The '666 Patent offers nothing more beyond these teachings, instead providing a simple arrangement of components known to act as a nutritional supplement for pregnant and lactating women mixed into a single formulation within specific, non-critical ranges, with the intention that such a formulation act in the same way as taught in the prior art, without any improved results. A predictable variation of something known in the art is "obvious." KSR, 127 S.Ct. at 1740. Claim 1 of the '666 Patent is invalid as being obvious under 35 U.S.C. § 103(a), in light of the '539 Publication, either alone or in combination with the '392 Publication.

Claims 21 and 22 of the '666 Patent are similarly invalid as being obvious. Claim 21, dependent from Claim 1, extends the composition of Claim 1 to further include a vitamin A, B, or D compound. Claim 22, also dependent from Claim 1, extends claim one to include iron. The '539 Publication and the '392 Publication independently teach a composition comprising vitamin A, a B complex vitamin compound, a vitamin D compound, and iron. (See '539 Publication, Exhibit "B" hereto, at 4-5; '392 Publication, Exhibit "C" hereto, at Table 2. See also Borenstein Declaration, Exhibit "D" hereto, at pp. 13-14.) More specifically, Table I of the '539 Publication teaches the composition may be comprised of iron and vitamins A, B1, B2, $B_6$, and

D2. Similarly, Tables 1 and 2 of the '392 Publication teach that the composition may also be comprised of iron and vitamins A, B1, B2, $B_6$, B12, and D3. Accordingly, both prior art references expressly teach not just one, but all of the limitations recited within claims 21 and 22 of the '666 Patent. Thus, Claims 21 and 22 of the '666 Patent are obvious as a result of the '539 Publication, either alone or in combination with the '392 Publication.

Based on the above, the differences between the subject matter falling under the '666 Patent and the prior art (i.e., the '539 Publication and the '392 Publication) are "such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art." 35 U.S.C. § 103. The scope and content of the prior art is substantially similar with the subject matter falling under the '666 Patent, and there are few, if any, differences between the subject matter of the '666 Patent and the prior art. Any difference that may exist relates solely to the dosage levels of the components in the product, which is not a significant difference.

As discussed above, a finding of "obviousness" is predicated upon the following factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations of non-obviousness, such as commercial success, long felt but unsolved need, failure of others to find a solution to the problem at hand, and acquiescence of others in the industry that the patent is valid. Corning, 400 F. Supp. 2d at 670. Here, the scope of the '666 Patent and the prior art found in the '539 Publication, either alone or in combination with the '392 Publication, is essentially identical. There are no substantial differences between Ther-Rx's claimed subject matter and the prior art. Further, "[i]f a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." KSR, 127 S.Ct. at 1740. All of the dosages of vitamins within each of the formulations provided by the '666 Patent fall within the

ranges recited in the '539 Publication. Thus, it would have been obvious for someone of ordinary skill in the art to determine the formula that forms the basis of the '666 Patent. (See Borenstein Declaration.)

Ther-Rx's argument that its alleged commercial success in marketing the PrimaCare® ONE product weighs against a finding of obviousness, is without merit. Relevant secondary considerations of non-obviousness also include a long felt but unsolved need for the product, failure of others to find a solution to the problem at hand, and acquiescence of others in the industry that the patent is valid. Corning, 400 F. Supp. 2d at 670. Ther-Rx itself concedes that several other companies have developed varying formulations of prenatal vitamins with EFA's. (Ther-Rx's Opening Brief, at 20.) Therefore, there is neither a "long felt but unsolved need" for the relevant product nor a "failure of others to find a solution to the problem at hand." To the extent that there is any commercial need, it is for a generic brand of the relevant product, to present a choice for consumers who until recently, were forced to pay Ther-Rx's inflated prices for its simple and known vitamin product.

For at least the foregoing reasons, the '666 Patent is invalid under § 103 because its subject matter was "obvious" to persons having ordinary skill in the art. As a result, Ther-Rx's has no likelihood of success on the merits of its claim for patent infringement and its request for injunctive relief must be denied.

**2. Ther-Rx does not have a reasonable probability of success on its claims under the Lanham Act.**

To establish trademark infringement and a violation of Section 32 of the Lanham Act, Ther-Rx must demonstrate that: (1) the marks are valid and legally protectable; (2) it owns the marks; and (3) defendants' use of the marks to identify goods is likely to create confusion concerning the origin of the goods. 15 U.S.C. § 1114(1)(a); Opticians Ass'n of America v.

Independent Opticians of America, 920 F.2d 187, 192 (3d Cir. 1990). To establish unfair competition and a violation of Section 43(a) of the Lanham Act, which prohibits a false designation of origin of goods or services regardless of whether the misrepresentation involves registered marks, Ther-Rx must show that: (1) Lannett has made false or misleading statements as to its own product or that of another; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales and a loss of goodwill. 15 U.S.C. § 1125(a); Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 19 F.3d 125, 19 (3d Cir. 1994), citing U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 922-23 (3d Cir. 1990).

Thus, for both Lanham Act claims, Ther-Rx must demonstrate that Lannett's actions have caused "a likelihood of confusion." In addition, to establish unfair competition under Section 43(a) of the Lanham Act, Ther-Rx must establish, inter alia, that Lannett has made false or misleading statements as to its own goods or that of another and that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience.

**a. Lannett has not made any false or misleading statements and is permitted to refer to Ther-Rx's product as "fair use" in comparative advertising.**

Ther-Rx has utterly failed to cite one false statement made by Lannett. Ther-Rx points to the following language found on Lannett's product packaging: "Compare to the active ingredients in PrimaCare® ONE* *Registered trademark of Ther-Rx Corp." However, Lannett's product contains no statement whatsoever, let alone a misleading statement, that Lannett's product is PrimaCare® ONE or that it was manufactured or developed by Ther-Rx or, for that

matter, that is it identical to PrimaCare® ONE. Rather, it simply invites the consumer to compare the active ingredients in Lannett's product to PrimaCare® ONE.

Such comparative advertising has long been permissible under the law and does not constitute a violation of the Lanham Act. Comparative advertising is "beneficial to consumers" because "[t]hey learn at a glance what kind of product is for sale and how it differs from a known benchmark." August Storck K.G. v. Nabisco, Inc., 59 F.3d 616, 618 (7th Cir. 1995). Even if there is some degree of confusion on the part of consumers as a result of one party's descriptive use of words contained in another's trademark, such use is tolerated under the law of fair use. KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 122, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004). "Since the burden of proving likelihood of confusion rests with the plaintiff, and the fair use defendant has no free-standing need to show confusion unlikely, it follows... that some possibility of consumer confusion must be compatible with fair use, and so it is." Id.

**i. Lannett's use of Ther-Rx's trademark constituted a "fair use."**

The Lanham Act allows for the fair use of trademarks in comparative advertising, and provides that such marks may be used as a descriptor or identifier of a competitor's product. Section 33(b)(4) of the Lanham Act specifically provides that a claim of trademark infringement is subject to the fair use defense:

> That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business,...or of a term or device which is descriptive of and used fairly in good faith only to describe the goods or services of such party, or their geographic origin.

15 U.S.C. § 1115(b)(4). Thus, fair use will exist where: (1) the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or

service; (2) the defendant uses only so much of the plaintiff's mark as is necessary to describe the plaintiff's product; and (3) the defendant's conduct or language reflect the true and accurate relationship between the plaintiff and the defendant's products or services. Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 222 (3d Cir. 2005).

All three elements of fair use are present in this case. First, when determining whether the use of the mark is necessary to describe the products or services, "the court need not find that the use of the mark is indispensable," since "the Lanham Act does not compel a competitor to resort to second-best communication." Id. at 229. Instead, "the court need only be satisfied that the identification by the defendant of plaintiff's product or service would be rendered significantly more difficult without use of the mark." Id. Here, Lannett's product is a generic version of Ther-Rx's product, PrimaCare® ONE. As a result, it would be extremely difficult, if not impossible, for Lannett to make a comparison of its multivitamin to PrimaCare® ONE without specifically naming Ther-Rx's product, to which Ther-Rx itself has found necessary to name "PrimaCare® ONE." Thus, since the term "PrimaCare® ONE" is necessary to describe both Lannett's and Ther-Rx's products, the first element of fair use is satisfied.

Second, Lannett has used only so much of Ther-Rx's mark as is necessary to describe the plaintiff's product. Honoring Ther-Rx's trademark, Lannett printed the term "PrimaCare® ONE" on its bottle, using the registered trademark symbol and noting that the term was a registered trademark of Ther-Rx. Lannett did not use any of the remaining aspects of PrimaCare's packaging, such as its orange and tan box, or white bottle covered by a similarly designed orange and tan label, both of which contain elaborate designs including six (6) different colored cameos of pregnant women holding hands with pictures near their stomachs that appear to depict their smiling unborn children. (See photographs attached as Exhibit "E," hereto.) Nor

did Lannett copy the slogan printed on Ther-Rx's box, "Right for each mom and baby." Id. Rather, Lannett used only the name of Ther-Rx's product for the purpose of describing Lannett's multivitamin, which is a generic for Ther-Rx's PrimaCare® ONE.

Third, Lannett's use of Ther-Rx's trademark reflects the true and accurate relationship between Ther-Rx and Lannett's product. "A defendant's purposeful portrayal of plaintiff's endorsement of its product through defendant's conduct or language does not necessarily render the use unfair, as long as the depiction of the endorsement is accurate." Id. at 231. Here, Lannett applied a label to its product which mentioned PrimaCare® ONE and with an asterisk immediately below Ther-Rx's product name, wrote "Registered trademark of Ther-Rx Corp." Thus, Lannett specifically highlighted the fact that PrimaCare® ONE was a different product manufactured by a different company. Lannett's labeling did not suggest that Ther-Rx manufactured Lannett's product, or that Lannett's product was PrimaCare® ONE. Thus, this element also weighs in favor of a finding of fair use.

**ii. Use of another's trademark in comparative advertising is permissible.**

Courts have routinely upheld the use of a competitor's mark in comparative advertising. In G.D. Searle & Co. v. Hudson Pharmaceutical Corp., 715 F.2d 837 (3d Cir. 1983), the Third Circuit Court of Appeals held that the use of a competitor's trademark for purposes of comparative advertising does not constitute trademark infringement. In Searle, the plaintiff developed and sold a vegetable laxative-psyllium hydrophilic mucilloid known as Metamucil®, which was sold in a fourteen-ounce cylindrical, white screw-top container with green printing on a white background, describing the product. The defendant sold a similar product and, in 1980, changed its container to look more like the Metamucil® container, as a cylindrical container with a white screw-top and green writing printed directly on the white background of the container.

The defendant also printed on its container the words "Equivalent to METAMUCIL." Id. at 839. The plaintiff subsequently brought suit under Sections 1114(1) and 1125 of the Lanham Act, claiming that the defendant infringed on its trademark and created a likelihood of confusion among consumers.

The trial court in Searle granted the plaintiff's motion for injunctive relief and entered a permanent injunction, requiring the defendant, if it chose to continue referring to Metamucil on its packaging, to revise its package to add the following statement: "METAMUCIL® is made by G.D. Searle & Co. Searle does not make or license REGACILIUM®." On appeal, the plaintiff contended that it was entitled to a decree that foreclosed the defendant from making any reference to Metamucil on its product container, and that the trial court erred in allowing the defendant to use the name of the plaintiff's product at all, even with the aforementioned disclosure.

On appeal, the court in Searle affirmed the trial court's order, observing that ***"[t]he use of a competitor's trademark for purposes of comparative advertising is not trademark infringement*** 'so long as it does not contain misrepresentations or create a reasonable likelihood that purchasers will be confused as to the source, identity, or sponsorship of the advertiser's product.'" Id. at 841 (emphasis added), quoting SSP Agricultural, Etc. v. Orchard-Rite, Ltd., 592 F.2d 1096, 1103 (9th Cir. 1979). The court opined that the registration of a proper noun as a trademark "does not withdraw it from the language, nor reduce it to the exclusive possession of the registrant which may be jealously guarded against any and all use by others." Id., quoting Societe Comptoir de L'Industrie v. Alexander's Department Stores, Inc., 299 F.2d 33 (2d Cir. 1962). On the contrary, trademark registration only "bestows upon the owner of the mark the limited right to protect his good will from possible harm by those uses of another ***as may***

***engender a belief in the mind of the public that the product identified by the infringing mark is made or sponsored by the owner of the mark.*** Id. (emphasis added). Thus, if the mark is used in a way that is truthful and does not deceive the public, there is no "sanctity in the word as to prevent its being used to tell the truth. It is not taboo." Id. at 843, quoting Holmes, J., writing for the court in Prestonettes, Inc. v. Coty, 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed.2d 731 (1924).

Although not binding upon this Court, the case of Zoller Laboratories, LLC v. NBTY, Inc., 111 Fed. Appx. 978 (10th Cir. 2004), is instructive. There, the plaintiff marketed a weight-loss dietary supplement known as "Zantrex-3". The defendant subsequently marketed a product known as "ZN-3" and included on its product labeling the statement "Compare to the Ingredients of Zantrex-3." The plaintiff brought suit, claiming that the "Compare to" language statement had only one possible meaning – that the two products were identical – and that ZN-3 was a cheaper equivalent to Zantrex-3. Id. at 980. The court compared the labels of the products and noted that there were some differences in the two products, most notably, the amount of caffeine and niacin found in the supplements. Id. at 980-81. However, the court in Zoller Laboratories held that the "Compare to" language did not constitute a false statement made to the consumer, in violation of the Lanham Act. On the contrary, the court observed that such comparative advertising can be interpreted by consumers in many ways other than that the two products are identical. "A consumer could reasonably interpret the 'Compare to the Ingredients' statement as meaning simply that the two products contain the same thirteen key, or active, ingredients." Id. at 983. The "Compare to" language could also "reasonably be interpreted as meaning that there are similarities between the two products or could simply mean what it says: that the consumer is invited to compare the ingredients." Id. In light of these possible and reasonable different

interpretations, the court in Zoller concluded that the comparative statements contained on the bottle were not conclusively false.

As in Zoller and Searle Lannett properly and lawfully used comparative labeling to invite the consumer to "Compare to the active ingredients in PrimaCare® ONE* *Registered trademark of Ther-Rx Corp." Lannett invites the consumer to review the active ingredients in both products and make a determination as to whose product to purchase. Lannett's product contains no false representations or even a suggestion that its Multivitamin with Minerals is the same as PrimaCare® ONE or is affiliated with Ther-Rx. Such comparative labeling is entirely appropriate under the law.

Ther-Rx, having failed to prove that Lannett has made false or misleading statements as to its own product or that of another, is not entitled to relief under the Lanham Act.

**b. There has been no actual deception by Lannett, nor is there a tendency that Lannett's product packaging will deceive a substantial portion of the intended audience.**

If an advertisement is literally false, the plaintiff is not required to prove actual consumer deception, but if an advertisement is "literally true," the plaintiff cannot obtain relief simply by arguing how consumers could react. Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 171 (3d Cir. 2001). Rather, the plaintiff must show "how consumers actually do react" to the allegedly misleading advertisement.

Ther-Rx has provided absolutely no evidence that anyone (including Ther-Rx's own declarants) has been deceived by Lannett's product packaging or advertising and, further, that Lannett's product has even a tendency to deceive. As stated above, Lannett's bottle contains the statement "***Compare to*** the active ingredients in PrimaCare® ONE* *Registered trademark of Ther-Rx Corp." (Emphasis added.) Lannett's product does not suggest that it ***is*** PrimaCare®

ONE or that it was manufactured by or associated with Ther-Rx. The largest writing on Lannett's packaging, in the center of the bottle, is the generic product name, "Multivitamin with Minerals," offering a clear distinction from the name "PrimaCare® ONE," which is written in much smaller writing closer to the top of the bottle. Moreover, Lannett's name is printed much larger on the bottle than is Ther-Rx's name.

Consumers comparing the two products, as Lannett's product invites them to do, would determine easily which product is the name brand and which is the less expensive generic alternative. Moreover, Pharmacists are required by law to designate the actual product that is contained in the prescription, including its manufacturer and the name of the product contained therein. Therefore, if a physician prescribed PrimaCare® ONE and did not designate that a generic substitution was impermissible, and a pharmacist filled the prescription using Lannett's Multivitamin with Minerals product, the pharmacist would be required to disclose on the label of the prescription the manufacturer (i.e., Lannett) and the actual content of the bottle (i.e., the Multivitamin with Minerals). (See Borenstein Declaration, Exhibit "D" hereto, at p. 15.) In addition, Lannett's product is packaged in a white screw-top bottle, with a label containing primarily purple and red writing. (See photographs attached as Exhibit "E," hereto.) By contrast, PrimaCare® ONE is packaged in an orange and tan box, containing a white bottle covered by a similarly designed orange and tan label, both of which contain elaborate designs including six (6) different colored cameos of pregnant women holding hands with pictures near their stomachs that appear to depict their smiling unborn children. Id. Ther-Rx's box also contains the slogan "Right for each mom and baby." Id.

In its Opening Brief, Ther-Rx conveniently fails to mention its own product packaging because, if there can be any confusion concerning packaging of any of these products, such

confusion would result solely from Ther-Rx's own misrepresentations in the packaging of PrimaCare® ONE. According to the product information available on Ther-Rx's website, at www.primacareone.com/pdf/PI.pdf, "PrimaCare® is supplied in a 30-day unit-of-use ***dispensing carton containing blister cards*** of 30 capsules and 30 tablets." (See PrimaCare product information from www.PrimaCareOne.com website, a copy of which is attached hereto as Exhibit "G.") Another page on Ther-Rx's website, www.primacareone.com/patients_landing.aspx, contains a photograph illustrating that the PrimaCare and PrimaCare® ONE packages are sold in a box that is sized and fitted for the previously referenced blister cards. (See Exhibit "G.") Thus, ***based on Ther-Rx's own www.PrimaCareOne.com website***, a woman intending to purchase PrimaCare® ONE, or a pharmacist or supplier intending to sell it, would reasonably expect to receive a box containing blister cards of PrimaCare® ONE capsules. As stated above, however, PrimaCare® ONE capsules are typically packaged in a bottle, which is then placed into a box with a much different size and shape. Thus, any consumer confusion concerning the packaging of PrimaCare® ONE was plainly caused by Ther-Rx's inaccurate advertising. In any event, a woman, pharmacist or supplier would initially expect to receive PrimaCare® ONE in one of two different types of boxes. Lannett's "Multivitamin with Minerals" product comes only in a bottle that is plainly different in appearance than the one in which a consumer would expect PrimaCare® ONE to arrive. Thus, there is no evidence to suggest that Lannett has created actual deception or at least a tendency to deceive a substantial portion of the intended audience.

**c. Lannett has not created a defective or inferior product.**

Lannett vigorously disputes Ther-Rx's claim that Lannett's Multivitamin with Minerals product is defective and smells and tastes of fish, and Lannett intends to take extensive discovery

concerning the circumstances surrounding which the sample used by Ther-Rx was purchased, opened, tested and otherwise treated. As stated in the Declaration of Ernest J. Sabo, Lannett's Vice President of Regulatory and Corporate Compliance, Lannett regularly performs and insists on a careful analysis of all products produced for released into the stream of commerce, and its products are consistently and routinely evaluated from an independent third party using industry accepted standards. (See Declaration of Ernest J. Sabo, Exhibit "H" hereto, at p. 2, at ¶ 1.) Ther-Rx's argument concerning Lannett's fish oil product is nothing more than a red herring because, as Ther-Rx's own website advertises, the source of the Omega-3 fatty acids in PrimaCare® ONE is also fish oil. (Sabo Declaration, at p. 4.) Thus, both Lannett's multivitamin and PrimaCare® ONE have the potential to smell of fish when a capsule is broken. (Sabo Declaration, at p. 5.) Ordinarily, however, when Lannett's product is not mistreated and is opened, one smells the scent of vanilla, much like Ther-Rx's product. (Sabo Declaration, at p.5.)

Furthermore, Ther-Rx has gone to great lengths to argue in its Opening Brief, and to third parties outside this litigation[5], that Lannett's product is inferior to PrimaCare® ONE because it allegedly contains only 109 mg of Docosahexaenoic Acid ("DHA") and 175 mg of Eicosapentaenoic Acid ("EPA") (less than 300 mg total) as components of the Omega-3 fatty acids in its product, as opposed to the 300 mg that are found in PrimaCare® ONE. First, Ther-Rx's bald conclusion is based upon alleged testing of only two single capsules of unknown origin, using unknown tests and standards. This is simply not credible science. As stated in the Declaration of Ernest J. Sabo, repeated testing of thousands of capsules from dozens of lots

[5] On June 19, 2008, Ther-Rx sent form letters to many of Lannett's customers, claiming that Lannett's multivitamin is inferior to PrimaCare® ONE and that Lannett has acted to deny physicians and pregnant women important information concerning its product. (A true and correct copy of Ther-Rx's letter dated June 19, 2008, is attached hereto as Exhibit "I.") In its letter, Ther-Rx provides a similar discussion of its "testing" of Lannett's multivitamin, but does not detail the testing standards employed by Ther-Rx.

demonstrates that Lannett's Multivitamin with Minerals contains more than 300 mg of Omega-3 fatty acids, which is the only representation that Lannett makes (and which is, in any event, the same amount represented as to PrimaCare® ONE). (See Sabo Declaration, at p. 3.) Thus, Ther-Rx's argument that Lannett's product contains a lesser amount of omega-3 fatty acids is factually incorrect.

Second, an examination of the labeling and packaging of several PrimaCare One products reveals an issue Ther-Rx avoids telling this Court. Ther-Rx itself does not consistently advise consumers what is contained in the PrimaCare® One product. The box and bottle of one sample of PrimaCare® One (from Lot 79491, expiration date 10/2008), for example, indicates that each capsule of Ther-Rx's product contains 300 mg of Omega-3 fatty acids. (See Sabo Declaration, at p. 4.) The box of a second sample of PrimaCare One (from Lot 64036, expiration date 5/2009) indicates that each capsule of Prima Care One contains 330 mg of Omega-3 fatty acids, breaking this down to 260 mg DHA, 40 mg of EPA and 30 mg of linolenic acid. (See Sabo Declaration, at p. 4.) The bottle from that same box, however, merely advises that the capsule contains 330 mg of omega-3 fatty acids and the front of the label suggests only DHA and EPA are included in that ingredient category. Moreover, since the box may not be provided to the patient, Ther-Rx thus provides different advice to the pharmacist than it does to the consumer.

Lannett accurately describes the content of its product and Ther-Rx is in no position to demonstrate otherwise.

**d. Lannett has not created a likelihood of confusion in the market.**

Under either of its Lanham Act claims, Ther-Rx must demonstrate that Lannett's actions have caused "a likelihood of confusion." See 15 U.S.C. §§ 1114(1) or 1125(a). Notably, the Supreme Court has held that where a defendant establishes "fair use" of the plaintiff's trademark,

the defendant is not required to also disprove that there is a likelihood of confusion as a result of his use of the plaintiff's mark. KP, 543 U.S. at 122. That is because "some possibility of consumer confusion must be compatible with fair use." Id. at 121-22.

That said, Ther-Rx has also failed to satisfy its burden of proving that a likelihood of confusion. The Third Circuit has adopted a non exclusive list of factors to be considered in evaluating likelihood of confusion, commonly referred to as the "Lapp Factors."[6] Kos, 369 F.3d at 709. "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." Id. Each factor is weighed separately, although not all factors are given equal weight. Id. The different factors may properly be given different weights depending upon the particular factual setting, and a "district court should utilize the factors that seem appropriate to a given situation." Id. Notably, the Court of Appeals for the Third Circuit has also observed that only some of the Lapp factors are relevant to cases involving fair use. Century 21, 425 F.3d at 225-26.[7] Thus, although Lannett submits that none of the ten (10) Lapp factors weigh in favor of a finding of likelihood of

[6] See Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983). The ten (10) Lapp Factors are: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendants' market. Id.

[7] The Court in Century 21 specifically found that the first two Lapp factors, the degree of similarity between the owner's mark and the alleged infringing mark and the strength of the owner's mark, are not probative to confusion in fair use cases. Century 21, 425 F3d at 225. The most relevant factors in a fair use case are (1) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (2) the length of time the defendant has used the mark without evidence of actual confusion arising; (3) the intent of the defendant in adopting the mark; and (4) the evidence of actual confusion. Id. at 225-26. The relevancy of the remaining factors would depend upon their application to the specific case.

confusion, Lannett's discussion of these factors will be limited to the factors found by the Court in Century 21 to be most relevant.[8]

**i. Price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase.**

The difference in price of the parties' products weighs heavily against a finding of consumer confusion in this case

REDACTED

Thus, a consumer would not be misled or confused when faced with the two products.

Furthermore, the care and attention expected of consumers also demonstrates that there would be no confusion in the marketplace concerning the parties' products. Lannett submits that pharmacists and suppliers are the relevant "consumers" of the products at issue in this case, since they receive the product, stock it in their stores or pharmacies, and dispense it to the end-user to fill a prescription. Although women using PrimaCare® ONE or Lannett's multivitamin are admittedly the actual users of the products, they typically will not see the original packaging of the materials, such as the box in which the PrimaCare® ONE bottle is packaged. Further, pharmacists typically place a label over the products, shielding the information contained on the

---

[8] Although Ther-Rx relies heavily on the first Lapp factor regarding the "similarity of the marks," this factor, which is considered irrelevant under Century 21, still weighs in favor of Lannett. Even assuming, arguendo, that any similarity between the marks is found, such similarity is considered to be "disavowed" by the existence of a "'compare to' statement" and a disclaimer of affiliation which also appears on the product. See Klein-Becker USA, LLC v. Product Quest Manufacturing, Inc., 429 F.Supp.2d 1248, 1253 (D. Utah 2005). The inclusion of an admonition to the consumer to "compare to" another product "would surely help reduce or eliminate any potential confusion" as to the ownership of the product, and weighs against a finding that the marks are "similar." Pfizer, Inc. v. Perrigo Co., 988 F.Supp. 686, 698 (S.D.N.Y. 1997). See also Warner Lambert Co. v. McCrory's Corp., 718 F.Supp. 389, 398 (D.N.J. 1989) (comparative statements "distinguish[ ] the two products"). Thus, while there may indeed be some similarities in the marks, any such similarities are disavowed by virtue of Lannett's invitation that the consumer distinguish between the two products.

face of the bottle, which, in turn, obscures the end-user's ability to read that information.[9] Therefore, the women using these products are typically not making the "point of sale" decision when the allegedly infringing material is viewed. On the contrary, it is the pharmacists and suppliers who see the trademark material.

Regardless of who the relevant "consumer" is determined to be, application of this factor weighs against a finding of confusion. "Trained professionals such as doctors, pharmacists, and nurses are expected to be knowledgeable about and to exercise care in distinguishing between different medicines." Sanofi-Aventis v. Advancis Pharma. Corp., 453 F.Supp.2d 834, 851 (D. Del. 2006). Doctors and pharmacists who prescribe and distribute medicines "are generally more sophisticated consumers and, in the interest of their patients, exercise more care."[10] Id. Additionally, consumers who are selecting products or treatments that "'affect their physical appearance and health' are 'likely to exercise a great deal of care.'" Nature's Best, Inc. v. Ultimate Nutrition, Inc., 323 F.Supp.2d 429, 434 (E.D.N.Y. 2004). Women who are selecting products for their pregnancy and the health of their unborn children are undoubtedly even more likely to exercise a great deal of care in choosing what they put into their body. Accordingly, both pharmacists and the women using Lannett's multivitamin or PrimaCare® ONE would use great care in selecting a product. This factor also weighs against a finding that Lannett has caused a likelihood of confusion in the marketplace.

---

9 Lannett disputes Ther-Rx's allegation that pharmacists' labels cover everything on Lannett's multivitamin bottle ***except for*** the writing "Compare to the active ingredients in PrimaCare® ONE* *Registered trademark of Ther-Rx Corp." Ther-Rx has provided nothing other than anecdotal evidence in support of its claim and, to the contrary, Lannett's experience has been that at least some pharmacy's labels are large enough to cover up all of the writing on its multivitamin bottle, including the aforementioned material. (See Smith Declaration, at ¶ 18.)

**ii. Length of time Lannett has used the mark without evidence of actual confusion arising.**

Lannett's Multivitamin with Minerals has been on the market since June 2008. Thus far, there has been absolutely no evidence that any confusion concerning the two products has arisen. Thus, this factor weighs against a finding that there is a likelihood of confusion.

**iii. Lannett's intent in adopting the mark.**

Lannett's intent in using Ther-Rx's trademark was not to cause consumer confusion, but to avoid it. As stated in the declaration of Kevin Smith, Lannett's Vice President of Sales and Marketing, Pharmacists often lose track of which generic-brand products correspond to the "name-brand" products and, in the process, mistakes are made when selecting the proper pharmaceutical. (Smith Declaration, at ¶ 15.) For example, Ther-Rx also sells PrimaCare®, which contains the same ingredients as PrimaCare® ONE but is taken in both a tablet and a gel capsule. That product is dispensed with the instructions to take the two "pills." Were Lannett's product dispensed for a prescription of PrimaCare® with instructions to "take two daily," patients might accidentally take more vitamins than intended. Lannett's intention of placing the "Compare to" language on its bottle was to prevent pharmaceutical error. (Smith Declaration, at ¶ 15.) Thus, this factor weighs against a finding of a likelihood of confusion.

**iv. Evidence of actual confusion.**

As discussed above, Ther-Rx has failed to present even a scintilla evidence showing that anyone (including Ther-Rx's own declarants) have been confused by Lannett's product packaging or advertising. Thus, there can be no finding of a likelihood of confusion on this point.

---

[10] As discussed in section iii. below, Lannett has placed the "Compare to" language on its bottle for the specific purpose of allowing pharmacists to know for which pharmaceutical the Multivitamin with Minerals is a generic.

**v. Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media.**

Lannett and Ther-Rx do not advertise or promote their products through the same channels.

REDACTED

Lannett has not yet discovered all of the marketing and advertising efforts that have been undertaken by Ther-Rx. At a minimum, Ther-Rx advertises in women's health magazines and has established an extensive website devoted solely to PrimaCare and PrimaCare® ONE, www.primacareone.com, which contains product information for patients and healthcare providers, Frequently Asked Questions, product photographs, patient education brochures and other literature concerning the components of Ther-Rx's product.

**vi. Relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors.**

There can be no finding in the minds of consumers that Lannett's multivitamin is related to Ther-Rx or PrimaCare® ONE, other than that of the accepted relationship of a generic equivalent of a brand product. Lannett's packaging asks the consumer to "***Compare to*** the active ingredients in PrimaCare® ONE* *Registered trademark of Ther-Rx Corp." (Emphasis added.) Lannett's statement clearly distinguishes between the two products and highlights the fact that PrimaCare® ONE is a registered trademark of a different party, Ther-Rx. Furthermore, as discussed above, the packaging of Lannett's product and Ther-Rx's product is completely different. Lannett's product is packaged in a white screw-top bottle, with a label containing primarily purple and red writing. By contrast, PrimaCare® ONE is packaged in an orange and

tan box, containing a white bottle covered by a similarly designed orange and tan label, both of which contain elaborate designs and pictures, and the slogan "Right for each mom and baby." There can be no confusion amongst consumers that Lannett's product is related in any way to Ther-Rx.

**vii. Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendants' market.**

Lannett and Ther-Rx are both in the same target market. However, there are no facts to suggest that consumers might expect Ther-Rx to manufacture both products. As discussed at length above, Ther-Rx has used elaborate and colorful packing for its series of vitamins, PrimaCare and PrimaCare® ONE. By contrast, the packaging for Lannett's multivitamin is much more plain, with purple and red lettering on a white background. Further, Lannett invites the consumer to compare its product with that of Ther-Rx's. It defies logic to suggest that one company would invite the public to compare two or more of its own products for the purpose of allowing them the opportunity to choose the less expensive alternative. Thus, there is no likelihood of confusion on this point.

Application of the above factors clearly weigh against a finding that Lannett created a likelihood of confusion in the marketplace. These deficiencies are not improved by Ther-Rx's concession that the decision to substitute Lannett's product for PrimaCare® ONE is not due to confusion but a function of law, insurer preference or pharmacist profit. (See Declaration of Bernadette Vitali, R.PH., at ¶¶ 20-23.) Thus, Ther-Rx is unable to state a claim for a violation of the Lanham Act.

For all of the foregoing reasons, Ther-Rx is unable to demonstrate any possibility of success, let along a likelihood of success, on the merits of its claims pursuant to the Lanham Act. As a result, Ther-Rx has no likelihood of success on the merits of its claim for trademark infringement and its request for injunction relief must be denied.

**3. Ther-Rx is not entitled to equitable relief because of its unclean hands.**

The doctrine of unclean hands is an equitable doctrine standing for the proposition that "he who comes in into equity must come with clean hands." Precision Inst. Man. Co. v. Aut. Maintenance Mach. Co., 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The doctrine applies when a party seeking equitable relief has committed an unconscionable act immediately related to the equity the party seeks. Highmark, 276 F.3d at 174. Ther-Rx has unclean hands in at least two respects: (1) Ther-Rx has misinformed third parties as to the ingredients in and alleged inferiority of Lannett's product, and has falsely accused Lannett of "hiding" from the consumer facts concerning its product, while Ther-Rx has provided conflicting statements of its own concerning the ingredients of PrimaCare® ONE; and (2) on the basis of its inclusion of expired patent numbers on PrimaCare® ONE.

First, as discussed above, Ther-Rx has asserted, both in these proceedings and to third parties who were not named in this action, that Lannett's product is inferior to PrimaCare® ONE because, based on scientifically unacceptable testing by Ther-Rx, Lannett's product allegedly contains only 109 mg of DHA and 174 mg of EPA as components of the Omega-3 fatty acids in its product. Ther-Rx's claim is completely without merit, inasmuch as extensive quality control measures ensure that Lannett's Multivitamin with Minerals contains 300 mg of Omega-3 fatty acids, as indicated on Lannett's product label and package insert as well as advertised on certain PrimaCare® ONE products. (See Sabo Declaration, at p. 3.) Notwithstanding the invalidity of

its claims, Ther-Rx has sent at least two different letters to countless current and potential Lannett customers, stating that Lannett's product is inferior and that Lannett has denied its consumers of important information. As discussed above, these claims are patently untrue, and Ther-Rx has acted wrongfully in intentionally tarnishing the reputation of Lannett and its product.

Second, in marketing and selling its product, Ther-Ex has included the following statement in its product information packaged with its product:

> U.S. Patent Nos.: 4,822,816; 5,070,085; 5,494,681; 5,516,925; 5,945,123; 6,197,329; 6,214,379; 6,228,388; 6,258,846; 6,375,956; 6,488,956; 6,569,857; 6,576,666; 6,716,814; 7,112,609.
> Other U.S. Patents pending.

However, two of the Patent numbers stated on the packaging for Ther-Ex's product are expired, Patent No. 4,822,816 having expired on or about April 10, 2007, and Patent No. 5,070,085 having expired on or about April 18, 2006.

35 U.S.C. § 292(a) provides as follows:

> Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any work or number importing that same is patented for the purpose of deceiving the public, ... [s]hall be fined not more than $500 for every such offense.

Section 292 exists because "[t]here is an 'important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain.'" Pequignot v. Solo Cup Co., 540 F.Supp.2d 649, 653 (E.D. Va. 2008), quoting Lear, Inc. v. Adkins, 395 U.S. 653, 670, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). "Giving the patent holder free reign to list expired patent numbers on articles" would act contrary to the public interest of allowing would-be inventors and consumers from justifiably relying upon such marks "to assume that the patent holder retains control over how the article can be used, displayed, modified, or licensed," as such

markings provide a "ready means of discerning the status of the intellectual property embodied in an article of manufacture or design." Id. at 654, quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 162, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). To require potential inventors and consumers to look up every patent marking to determine whether the patent was valid or expired would "inhibit the free flow of ideas and 'the benefits of the unrestricted exploitation' with respect to those articles that have entered the public domain." Id. at 654, quoting Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 255, 66 S.Ct. 101, 90 L.Ed.2d 47 (1945).

The markings on Ther-Rx's packaging was clearly intended to deceive the public. The relevant inquiry is whether the seller had a "reasonable belief" that the articles were covered by the patent. Pequignot, 540 F.Supp.2d at 655-56. Ther-Rx was and remains aware of the patents it has held and the dates on which they expired and had no reasonable belief that its products were covered by all of the patents identified on its packaging. This improper conduct cannot be sanctioned by granting equitable relief even if Ther-Rx were able to satisfy the high standards required for a preliminary injunction. Highmark, 276 F.3d at 174.

**C. Ther-Rx has not demonstrated the existence of irreparable harm in the absence of the requested injunction.**

Where a party seeks a mandatory injunction that will alter the status quo, that party "must meet a higher standard of showing irreparable harm in the absence of an injunction." Bennington Foods, 2008 WL 2331394, at *3. "The irreparable harm requirement is met if the plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages. This is not an easy burden." Adams v. Freedom Forge Corp., 204 F.3d 475, 484-85 (3d Cir. 2000) (citations omitted). Loss of income alone does not constitute irreparable harm, since the nature of the remedy is "purely

economic in nature and thus compensable in money." Id. Here, all of Ther-Rx's alleged harm is compensable by an award of monetary damages and therefore, is not "irreparable."[11]

REDACTED

D. **The balance of hardships weighs against the entry of the requested injunction.**

REDACTED

By contrast, Ther-Rx asserts in its own brief that it believes Lannett is struggling financially and that "there is no reason to believe that its financial condition will suddenly improve." (Ther-Rx Opening Brief, at 34.)

REDACTED

[11] In its Opening Brief, Ther-Rx contends that based upon its limited review of Lannett's financial information, it believes that Lannett will be unable to pay the judgment to which Ther-Rx alleges it is entitled. Lannett disputes Ther-Rx's claim that any damages award, let alone one as astronomical as that alleged by Ther-Rx, would be appropriate in this case. Lannett also takes issue with the cynical views expressed by Ther-Rx as to Lannett's financial condition although, as discussed in section D., below, the entry of the injunction sought by Ther-Rx would indeed result in severe harm to Lannett's operations.

REDACTED

Therefore, the harm that would result to Lannett if the requested injunction is granted would be much greater than any alleged harm that might result to Ther-Rx in the absence of an injunction.

**E. The entry of the requested injunction would be contrary to the public interest.**

Without question, the public has a strong interest in generic competition in the pharmaceutical market. See Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (public interest favored denial of injunction against generic drug manufacturer because "the purpose of the Hatch-Waxman Act was, after all, to increase competition in the drug industry....Congress expected that competition 'to make available more low cost generic drugs'"). See also Sandoz, Inc. v. Food and Drug Admin., 439 F.Supp.2d 26, 33 (D.C. Cir. 2006) (proposed injunction against generic drug manufacturer would "not only harm hundreds of thousands of patients, it would also go against the clear purpose of the Hatch-Waxman Act, which is to 'get generic drugs into the hands of patients at reasonable prices-fast'"). Generic competition is particularly important in light of the skyrocketing cost of prescription drugs,

which eat up available healthcare funds. Generic pharmaceuticals, which provide the same medicines and the same results, are critical to helping contain healthcare costs. It is essential that generic drug manufacturers such as Lannett be permitted access to enter the market so that the public is not forced to continue to needlessly pay inflated prices for pharmaceuticals.

By contrast, the public interest is not served by the enforcement of invalid patents "or the extension of monopoly pricing by means of invalid patents over the distribution of low cost pharmaceuticals." Abbott Laboratories v. Sandoz, Inc., 500 F.Supp.2d 846, 855 (N.D.Ill. 2007). Patents are "an exception to the general rule against monopolies and to the right to access to a free and open market." In re: Relafen Antitrust Litigation, 360 F.Supp.2d 166, 183 (D.Mass. 2005). Therefore, "the public has a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." Id. For several years, Ther-Rx has had a monopoly on its PrimaCare® and PrimaCare® ONE products based on a patent that is invalid for obviousness pursuant to 35 U.S.C. § 103. The public has a significant interest in opening Ther-Rx's improper monopoly, and in allowing generic drug manufacturers, such as Lannett, to introduce more competitively priced pharmaceuticals.

Lannett's product packaging creates no consumer confusion as between Lannett's Multivitamin with Minerals and Ther-Rx's PrimaCare® ONE. To the contrary, Lannett's product labeling invites consumers to compare the two products. Such comparative marketing is not unfair or improper. On the contrary, it benefits the public interest because it invites consumers to make an informed decision when choosing between two competing products. Such choice is fundamental to our nation's capitalist economy and is fundamental to the public interest. Accordingly, this factor weighs heavily in favor of denying Ther-Rx's Motion.

**CONCLUSION**

For all of the foregoing reasons, the Motion of Counterclaim-Plaintiffs, KV Pharmaceutical Company, Ther-Rx Corp. and Drugtech Corp. for Temporary Restraining Order, Early Preliminary Injunction Hearing and Preliminary Injunction, must be denied.

/s/ Sophia Siddiqui
Sophia Siddiqui, Esquire (No. 4914)
Gerard P. Norton, Esquire
Alfred J. Monte, Jr., Esquire
Jonathan R. Lagarenne, Esquire
Joshua M. Hummel, Esquire
Fox Rothschild LLP
Citizens Bank Center
919 N. Market Street, Suite 1300
Wilmington, DE 19801
(302) 622-4278
(302) 656-8920 (facsimile)

*Attorneys for Plaintiff, Lannett Company, Inc.*

Dated: June 23, 2008.